## A05A0195. JACKSON v. THE STATE.
(617 SE2d 249)

RUFFIN, Chief Judge.

A Chatham County jury found Joseph Jackson guilty of aggravated assault. In his sole claim of error, Jackson contends that the trial court erred in denying his motion for a directed verdict of acquittal. After review, we find no error and affirm.

On appeal, Jackson no longer enjoys a presumption of innocence, and the evidence must be viewed in a light most favorable to the jury's verdict.[1] So viewed, the evidence shows that between 11:42 p.m. and 11:48 p.m., Harris Odell III was shot just outside his home in Savannah. While Odell was pulling his car into the garage, Javonni McKinney fired multiple shots at Odell at close range. Before Odell's return home, Jackson and McKinney had been awaiting Odell's return inside a stolen Buick station wagon that McKinney had obtained a few hours earlier. Less than an hour before the shooting, a friend of Odell's uncle saw the Buick proceeding slowly down Odell's narrow residential street, passing by his house on two occasions.

As Odell drove into his garage, McKinney ran into the garage and fired several shots. Although mortally wounded, Odell managed to back his car into the street where it struck the Buick on the driver's side. The collision either disabled the Buick or caused Jackson and McKinney to abandon it. Odell's girlfriend heard four or five shots, followed by the squeal of tires, from the living room. She ran outside and saw that Odell was slumped backward in his seat with blood dripping from his neck and that his car was in the street. At the time of the shooting, Jackson was behind the steering wheel of the Buick waiting for McKinney to return to the car. Odell's neighbor heard several gunshots "fired in rapid succession." From her window, the neighbor saw that the glass in the back window of Odell's car had been shattered. She also saw a man leaning into the front passenger area of the Buick as though searching for something. As she watched, the man casually looked around as if to see if anyone was watching before walking calmly down the street and away from the crime scene. She described the man's demeanor as "very calm" and testified that he did not appear upset. Although she could not identify Jackson in court as that man whom she had seen, her description of the man's race, build, age, and height was consistent with Jackson's physical appearance. Investigators found Jackson's cellular telephone next to the Buick just below the passenger side door. They also found a receipt from a Burger King for a food and drink purchase made at 11:13 p.m., shortly before the victim was gunned down. A

---

[1] See *Wilson v. State*, 270 Ga. App. 555, 556 (607 SE2d 197) (2004).

detective testified that "[a]ll shell casings [were] found inside the garage." While executing a search warrant at Jackson's home, police found a second receipt from Burger King on Jackson's dresser in his bedroom. This receipt had the same order number as the receipt found in the Buick.

Jackson supplied several contradictory accounts about the events of that night. In his first statement, Jackson denied knowing McKinney and said that he asked for a ride because it was cold outside. He claimed that after "just sitting back chilling," they stopped at a Burger King after which he was taken home at 9:00 or 9:30 p.m. where he stayed for the remainder of the night. He denied knowing anything about a shooting in the area. In another statement, Jackson termed McKinney "an old friend" and stated that before getting a ride, he made sure that the car was not stolen. He denied being present at the shooting and said that he lost his phone in the car before going home. In his third statement, Jackson admitted that he and McKinney had been waiting for a man to come home, but claimed they were waiting so McKinney "could front some dope." In this version, Jackson said that McKinney jumped from the car and ran to the garage and had his gun out even before going into the garage. Jackson claimed that he then had moved to the driver's side "to get a better view" of what McKinney was doing. Then, after the car backed rapidly out of the garage, he began gathering his belongings but left when a woman approached, screaming. Videotapes of Jackson's first two statements were shown to the jury and, in addition, an audiotape of his third statement was played for the jury.

A videotape of the crime scene recorded the night of the shooting was also shown to the jury. From the crime scene photographs and the videotape, the jury could see the short distance between the victim's garage and the street in front of his home. Based upon this and other evidence, the jury found Jackson guilty of aggravated assault, but acquitted him of malice murder, felony murder, possession of a firearm and theft by receiving a motor vehicle.

On appeal, Jackson contends that the trial court erred in denying his motion for a directed verdict of acquittal. Arguing that he was not a party to the crime, he claims that the evidence, at most, shows his "mere presence at the scene." Jackson asserts that the record contains no evidence that he and McKinney agreed to do anything or that he knew about McKinney's plans or that McKinney had a gun. He argues that McKinney was a known drug dealer and that he had no reason to suspect that McKinney's statement about "fronting [the victim] some dope" was untrue or a pretext for going to the man's home. He also argues that the trajectory of the bullets indicates panic more than a planned shooting.

Under OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime.[2] Where a getaway driver waited for his co-defendants to return to the car, the driver was also guilty of his co-defendants' crimes.[3] Similarly, a wife who assisted her husband by driving him to the scenes of the crimes and serving as his getaway driver was a party to her husband's crimes.[4]

Here, the record contains evidence from which a jury could find that Jackson participated in the crimes committed by McKinney.[5] A witness saw the Buick, the would-be getaway car, pass by the victim's house twice before the shooting. By Jackson's own admission, he was sitting behind the steering wheel at the time of the shooting. Yet the victim's garage was a short distance from the street and McKinney began shooting almost immediately after leaving the car. Whether Jackson had any reason to switch seats so quickly except to serve as the getaway driver or whether he had sufficient time to move to the driver's seat after McKinney left the car and before McKinney commenced firing at Odell were questions for the jury to decide.

From Jackson's conduct before, during, and after the murder, the jury was authorized to conclude that Jackson was a knowing participant in the shooting.[6] When Jackson left the Buick in the street, a witness noted that he did not seem particularly upset or surprised by the shooting. When afforded an opportunity to explain his role, if any, in the murder, Jackson offered inconsistent versions of key details. The jury was able to consider the contradictions in Jackson's audio and videotaped statements and determine what weight, if any, to give that evidence and also to decide whether Jackson's statements incriminated him. From this evidence, a rational trier of fact could have found Jackson guilty beyond a reasonable doubt of intentionally aiding and abetting McKinney in the commission of murder.[7]

Although Jackson contends that his conviction relied solely on circumstantial evidence and that the state failed to exclude every reasonable hypothesis except guilt as required by OCGA § 24-4-6, we find otherwise. A neighbor saw a man leaning into the car who fit Jackson's physical appearance. By his own admission, Jackson was

[2] *Hewitt v. State*, 277 Ga. 327, 329 (1) (a) (588 SE2d 722) (2003).

[3] See *Parnell v. State*, 260 Ga. App. 213, 219-220 (6) (581 SE2d 263) (2003).

[4] See *Head v. State*, 261 Ga. App. 185, 187 (1) (582 SE2d 164) (2003).

[5] See *Smith v. State*, 277 Ga. 95, 96 (586 SE2d 629) (2003).

[6] See *Hewitt*, supra.

[7] See id. at 329; *Johnson v. State*, 276 Ga. 368, 371 (1) (578 SE2d 885) (2003).

that man and was trying to gather his personal things but gave up when a woman approached, screaming. The jury heard and clearly rejected Jackson's protestation of "mere presence." Accordingly, the trial court did not err in refusing to direct a verdict.

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur.*

DECIDED JULY 11, 2005.

*Charles C. Grile*, for appellant.
*Spencer Lawton, Jr., District Attorney, Arvo H. Henifin, Assistant District Attorney*, for appellee.